CIVIL ACTION NO. 14-14-DLB-CJS

CHAD PRICE                                                        PLAINTIFF

vs.                    MEMORANDUM OPINION AND ORDER


AGRILOGIC INSURANCE SERVICES,                      DEFENDANTS
LLC, et al.

******************

Defendants Occidental Fire & Casualty Insurance Company of North Carolina and

AgriLogic Insurance Services, LLC (collectively referred to hereinafter as "AgriLogic") move

for summary judgment on Plaintiff Chad Price's (hereinafter "Price") breach of contract and

bad faith claims, arguing that they are time barred by a contract provision limiting the time

in which to bring suit.  In the alternative, AgriLogic maintains that summary judgment on the

bad faith claim is appropriate because Price failed to establish AgriLogic's obligation to pay

and did not present sufficient evidence of outrageous conduct by AgriLogic.  The Court has

original jurisdiction over this removed action pursuant to 28 U.S.C. § 1332.

## I.      Factual and Procedural Background

Price is a Central Kentucky farmer who tends a corn crop in Mason County and two

burley tobacco crops in Bourbon and Nicholas Counties.  (Doc. # 6-3 at 2).  In Spring 2012,

Price began working with his insurance broker, Pro-Line Insurance Services (hereinafter

"Pro-Line"), to obtain crop insurance for the upcoming growing season.  (Doc. # 7-1 at 1).

Price and Pro-Line insured his crops with Multi-Peril Crop Insurance (Policy Number 1017656) issued by AgriLogic. (Docs. # 7-13). With further assistance from Pro-Line, Price then applied for two Crop-Hail policies to cover his corn and tobacco crops against additional perils. (Docs. # 6-21 and 6-22).

On July 10, 2012, AgriLogic issued a Crop-Hail Policy with Wind Guard and Extra Harvest Expense Endorsement (Policy Number 8006659) (hereinafter "the corn policy"), which insured Price's corn crop against direct loss caused by hail, fire, lightning or transit. (Docs. # 6-3 at 2 and 6-6 at 1). The Wind Guard and Extra Harvest Expense Endorsement (hereinafter "the endorsement") provided further coverage for "wind damage, including green snap[1] and additional harvest expenses." (Doc. # 7-14 at 4). The endorsement defines "additional harvest expenses" as follows:

> The stalks of the insured crop on the unit are blown down by wind to the extent that the angle between the stalk and the ground is less than 20 degrees and the distance from the shank end of the highest ear on the stalk to the ground is less than 12 inches, but could still be mechanically harvested.

(*Id.*). Price's corn corp was insured up to a $356,000 policy limit, with a whole dollar premium of $7,476. (Doc. # 6-23 at 3).

The following day, AgriLogic issued a Crop-Hail Policy with Tobacco Wind Endorsement (Policy Number 8006765) (hereinafter "the tobacco policy"), which insured Price's burley tobacco crops against direct loss caused by hail, fire, lightning and wind with hail. (Doc. # 6-3 at 2). The tobacco crops were insured up to a $300,300 policy limit, with

---

[1] "Green snap" is defined as "a corn stalk free of insect, disease, chemical, or other pest damage that has been severed between the brace roots and the ear as a result of severe wind event to a point that it cannot be mechanically harvested. (Doc. # 7-14 at 4)

a whole dollar premium of $35,936. (Doc. # 6-23 at 4).

AgriLogic's Crop-Hail Policies generally impose the following duties on an insured: (1) provide written notice of probable loss within ten days after the occurrence of one of the insured perils; (2) care for each damaged field of insured crop until AgriLogic has examined it; (3) allow AgriLogic to examine the damaged crop as often as reasonably required; (4) provide a complete harvesting and marketing record of each insured crop upon request; (5) submit to an examination under oath upon request; (6) sign a Withdrawal of Claim if an inspection determines that there is no payable loss under the terms of the policy; (7) submit a signed statement in proof of loss, declaring your loss and interest in the crop, within sixty days of loss; and (8) if a claim is made on other insurance arising from the same occurrence for which a claim is made on this policy, provide AgriLogic with all claims material relating to other insurance upon request. (Doc. # 6-6 at 3). In return, AgriLogic has a duty to adjust all losses and pay the loss within thirty days after reaching an agreement with the insured, entry of a final judgment or the filing of an appraisal award. (*Id.*).

Section 16 of the Crop-Hail Policy's General Provisions sets out the following conditions for filing suit against AgriLogic:

> You cannot bring suit or action against us unless you have complied with all of the policy provisions.
>
> If you do enter suit against us you must do so within 12 months of the occurrence causing loss or damage.

(*Id.* at 5).

On July 20, 2012, less than two weeks after issuance of the corn and tobacco policies, Price's crops were allegedly damaged by wind and/or hail. (Doc. # 6-24). In

accordance with the policy terms, Pro-Line sent AgriLogic a Notice of Loss on Price's behalf five days later. (*Id.*). The Notice listed the primary cause of damage as hail. (*Id.*). However, the National Weather Service has no record of hail in Kentucky on the date of the alleged loss. (Doc. # 6-10). According to Beverly Todd, Pro-Line's office manager, the broker erroneously labeled paperwork that was later submitted on behalf of Price and several other farmers in the region. (Doc. # 7-1 at 1-2). Specifically, these claims were filed for hail damage when they should have been submitted for both hail and wind damage. (*Id.*). Upon discovery of this clerical error, Pro-Line notified AgriLogic that the claims should have been filed as wind with hail damage and the necessary corrections were made. (*Id.*).

After receiving notice of the alleged damage, AgriLogic began investigating Price's claims and adjusting the losses. (Doc. # 6-3 at 3). On October 30, 2012, Price and Mike McNew, one of AgriLogic's independent adjusters, submitted a Green Snap Wind Guard Appraisal Worksheet and Loss Adjustment Worksheet, purporting to verify the losses to Price's corn crop. (Docs. # 6-3 at 3 and 6-11). Around this time, AgriLogic discovered that McNew had improperly adjusted Price's claim under the corn policy. (Doc. # 6-3 at 3). Because McNew had a history of adjustment errors and procedural non-compliance, AgriLogic ceased using his services and initiated its own investigation of Price's claim. (*Id.*).

On November 2, 2012, AgriLogic investigator Geno Herges conducted a ground level audit of Price's corn crop. (*Id.*). As Herges' photographs show, there was no evidence of wind damage. (Doc. # 6-12). About five days later, AgriLogic investigators conducted an aerial survey of Price's corn crop. (Docs. # 6-3 at 4 and 6-13). These

investigators also found no evidence of wind damage.  (*Id.*).

According to Travis Laine (hereinafter "Laine"), AgriLogic's Product Implementation Manager, the lack of supporting weather data and photographic evidence gave AgriLogic reason to doubt the legitimacy of Price's claim.  (Doc. # 6-3 at 4).  AgriLogic asked Price's attorney, J. Richard Reid (hereinafter "Reid"), to provide additional evidence, such as production records or photographs, that might substantiate the claim.  (Doc. # 6-14).  In response, Reid asked that AgriLogic's "request be specific and [ ] state exactly what documentation you are seeking and an explanation of why you assert the documentation requested should be in our possession."  (Doc. # 6-15).  AgriLogic explained that it "did not presuppose that any particular item of information is in you or your clients' possession, but merely requests that any information tending to support the claimed losses be produced."  (Doc. # 6-16).  AgriLogic further stated that productions records and photographs were simply examples of documentation that would assist in its claim verification efforts.  (*Id.*).

By December 21, 2012, AgriLogic had not received any information from Reid, so it reiterated its request for further documentation.  (Doc. # 6-17).  About one week later, Reid sent AgriLogic production records and photographs of damage to the corn crop.  (Doc. # 6-18).  According to Laine, the photographs "were of poor quality, contained no frame of reference or authentication, and were taken at close range."  (Doc. # 6–3 at 5).  Moreover, the photographs "did not clearly indicate that [Price's] corn had sustained wind damage and were not consistent with the numerous aerial photographs and aerial video footage taken by AgriLogic's investigators just weeks earlier."  (*Id.*).

On February 28, 2013, AgriLogic denied Price's claim under the corn policy.  (Doc. # 6-20).  In its letter of denial, AgriLogic explained that Price's initial Notice of Loss reported

hail damage to his corn crop, which was inconsistent with National Weather Service reports for the date of the alleged loss. (*Id.*). Because the Worksheets submitted by Price reported wind damage, AgriLogic conducted field audits and aerial surveys of his corn crop. (*Id.*). However, these audits showed that the fields in question sustained no payable damage for wind." (*Id.*).

While AgriLogic processed Price's claim under the corn policy, his claim under the tobacco policy was also pending. (Doc. # 6-19). On January 30, 2013, AgriLogic determined that the total indemnity amount was $215,085, deducted the appropriate premium and credits, and sent Price a check for the remaining $141,581.83. (*Id.*). While the record is less detailed on this point, it seems that Price also submitted a claim under his MPCI policy relating to the same alleged wind damage. (Docs. # 7-13, 7-15, 7-16 and 7-17). Correspondence between Reid and AgriLogic indicates that this claim was resolved on August 22, 2013, when Price received a check for $59,376. (Doc. # 7-13).

On January 8, 2014, Price filed a Complaint in Mason County Circuit Court, asserting claims for breach of contract, bad faith, slander and punitive damages. (Doc. # 1-1). Because AgriLogic paid Price's claims under the tobacco and MPCI policies, this Complaint is specific to AgriLogic's handling of his claim under the corn policy. (*Id.*). AgriLogic removed this action to federal court on January 28, 2014. (Doc. # 1).

## II. Analysis

### 1. Applicable Law

Federal courts sitting in diversity apply federal procedural law. *Hanna v. Plumer*, 380 U.S. 460, 465 (1965). The substantive law of the forum state governs the claims

asserted. *Erie R. Co. v. Tompkins,* 304 U.S. 64 (1938); *Moore v. Coffey*, 992 F.2d 1439 (6th Cir. 1993); *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993). Accordingly, the Court will evaluate AgriLogic's Motion in accordance with the Federal Rules of Civil Procedure and apply substantive Kentucky law to Price's breach of contract and bad faith claims.

## 2. Standard of Review

AgriLogic has filed a Motion to Dismiss for Failure to State a Claim that presents matters outside the pleadings for the Court's consideration. (Doc. # 6). In such situations, the Federal Rules of Civil Procedure require the motion to dismiss to be construed as a motion for summary judgment. Fed. R. Civ. P. 12(d). Accordingly, the Court will look to the rules governing summary judgment in evaluating AgriLogic's Motion. Fed. R. Civ. P. 56(a).

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law. *Id.* Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be

evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252.

### 3. Threshold Considerations

Before responding to the time-bar issues, Price argues that the Motion should be denied as premature because discovery has not yet taken place. (Doc. # 7 at 9-11). While Rule 56(b) authorizes pre-discovery grants of summary judgment, Sixth Circuit case law is quite clear that this step should only be taken after the non-movant "receive[s] a full opportunity to conduct discovery to successfully defeat [the motion]. *Jefferson v. Chattanooga Publ'g Co.,* 375 F.3d 461, 463 (6th Cir. 2004); *Ball v. Union Carbide Corp.*, 385 F.3d 713, 719 (6th Cir. 2004) (internal quotations omitted).

 If the non-movant believes the motion to be premature, it must file an affidavit or motion giving the district court a chance to rule on the need for additional discovery. Fed. R. Civ. P. 56(d); *see also Ball*, 385 F.3d at 720. "Beyond the procedural requirement of filing an affidavit, Rule [56(d)] has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000). If the non-movant demonstrates that it "cannot presents facts essential to justify its opposition," the court may defer or deny the motion, allow the non-movant to obtain the requested discovery or issue any other appropriate order. Fed. R. Civ. P. 56(d).

Price's response fails to satisfy the requirements of Rule 56(d), both procedurally and substantively. The Rule 56(d) issue should be raised by motion or affidavit, rather than response, and must contain some explanation of its need for discovery. Moreover, the Court concludes that no amount of discovery will have any bearing on Price's breach of

contract claim, as the validity of the contractual limitation provision is a question of law that the Court can adjudicate on the record presently before it. As to Price's bad faith claim, the Court concludes that Price has failed to identify any genuine issues of material fact to preclude summary judgment, nor has he put forth anything to convince the Court that further discovery could rectify this issue. Accordingly, the Court sees no reason to deny or defer Defendant's Motion as premature.

### 4. Contractual Limitations on Time to Bring Suit

#### A. How does KRS § 304.14-370 affect contractual limitation provisions?

Kentucky law has long recognized "the validity of insurance contract provisions requiring as a condition to sue that the action must be 'commenced within the time specified by the policy.'" *Edmonson v. Penn. Nat. Mut. Cas. Ins. Co.*, 781 S.W.2d 753, 756 (Ky. 1989)(internal citations omitted). Courts typically enforced such provisions unless they unreasonably limited the time in which parties could sue. *See Ashland Finance Co. v. Hartford Accident & Indemn. Co.*, 474 S.W.2d 364, 366 (Ky. 1971)(holding that a "blanket bond" contract provision requiring a party to bring suit within one year after discovery of the loss was not unreasonable). However, KRS § 304.14-370 does place additional boundaries on a foreign insurer's ability to contractually limit the time in which a party can file suit:

> No conditions, stipulations or agreements in a contract of insurance shall deprive the courts of this state of jurisdiction of actions against foreign insurers, *or limit the time for commencing actions against insurance companies to a period of less than one year from the time when the cause of action accrues.*

(emphasis added).

Contractual limitation provisions often set the date of loss as the beginning of the limitations period, and while the Court does not read KRS § 304.14-370 as prohibiting this, it should be noted that the date of the loss is not synonymous with the date of accrual. After all, a cause of action generally does not accrue until the last event necessary to create the cause of action occurs. Therefore, KRS § 304.14-370 requires a limitation provision, however drafted, to effectively give the party one year to sue, counting from the date of accrual. In the context of a breach of insurance contract or bad faith cause of action, Plaintiff's claims would accrue on the date that the insurer denied coverage under the policy. Thus, the provision would only be upheld under KRS § 304.14-370 if it gave the party one year from the date of denial to sue.

Unfortunately, there is a dearth of case law evaluating the validity of contractual provisions in light of KRS § 304.14-370. Kentucky courts have skirted the accrual issue, focusing instead on whether KRS § 304.14-370 conflicts with other statutes of limitation. *See Webb v. Ky. Farm Bureau Ins. Co.*, 577 S.W.2d 17 (Ky. App. 1978)(finding that a one-year limitation provision did not conflict with the general fifteen-year statute of limitations for actions on written contracts); *Hale v. Blue Cross Blue Shield of Ky.*, 862 S.W. 2d 905, 907 (Ky. App. 1993)(considering whether a one-year limitation in a group health insurance policy conflicted with the three-year period required of blanket policies in KRS § 304.18-070(7)"); *Elkins v. Ky. Farm Bureau Mut. Ins. Co.*, 844 S.W.2d 423, 425 (Ky. App. 1992)(holding that a one-year limitation provision was unreasonable, and thus unenforceable, because it conflicted with the Motor Vehicle Reparations Act's two-year limitation period).

Only two federal cases have evaluated contractual limitation provisions under the parameters set by KRS § 304.14-370. However, these cases provide more confusion than guidance. Both courts considered the same limitation provision in light of KRS § 304.14-370, and yet, they reached two different conclusions about the clause's validity and impact on the plaintiff's claims. *Compare Smith v. Allstate Ins. Co.*, 403 F.3d 401 (6th Cir. 2005)(finding that the plaintiff's claim was barred by a KRS § 304.14-370 compliant provision requiring a party to sue "within one year of the inception of loss") *with Tennant v. Allstate Ins. Co.*, Civ. A. No. 04-54, 2006 WL 319046 (E.D. Ky. Feb. 10, 2006)(holding that same limitation provision violated KRS § 304.14-370 as to the plaintiff's claim because it did not accrue until denial of the plaintiff's claim for coverage). These decisions will be analyzed in detail below.

Having outlined its questions about the proper accrual date, the Court notes that this issue is particularly important because of the following timeline: Section 16 of the Crop-Hail Policy requires Price to bring suit within "one year of the occurrence causing the loss." Price's corn crop was allegedly damaged by wind on July 20, 2012. AgriLogic denied his claim for coverage under the Crop-Hail Policy on February 28, 2013 and Price filed suit on January 8, 2014. If the Court were to find that one or both of Price's claims accrued on the date of the loss, then Section 16 of the corn policy would be enforceable, as it comports with KRS § 304.14-370. Because Price filed this suit seventeen months after the loss, Section 16 would bar the claim or claims. However, if the Court determined that one or both of Price's claims accrued on the date of denial, then Section 16 of the corn policy would be unenforceable, as it effectively gives Price only six months from accrual to sue. In that situation, Price's claim or claims would not be barred. With these potential

consequences in mind, the Court will further analyze the accrual issue with respect to each of Price's claims.

## B. Is Section 16 of the corn policy valid as to Price's breach of contract claim?

### i. Compliance with KRS § 304.14-370

In *Smith v. Allstate*, the Sixth Circuit Court of Appeals found that the following suit limitation provision did not violate KRS § 304.14-370:

> No suit or action may be brought against [Allstate] unless there has been full compliance with all policy terms. Any suit or action must be brought within one year after the inception of loss or damage.

403 F.3d 401, 403 (6th Cir. 2005). At the beginning of its analysis, the court noted, as this Court did in the prior subsection, that "the logic of [KRS § 304.14-370] would seem to be that Allstate's one-year limitation period is not valid unless, as a matter of law, an insured's cause of action accrues on the date of his or her loss." *Id.* at 404-05. The court then considered a long line of Kentucky cases holding that a cause of action does not accrue until the plaintiff has the right to institute and maintain a suit. *Id.* at 405. In this case, that right depended upon the plaintiffs' compliance with the policy terms. *Id.* Recognizing that, if these cases controlled, the cause of action could not have accrued on the date of loss, the court found that they did *not* control for two reasons: (1) these cases did not deal with KRS § 304.14-370; and (2) "Kentucky courts have repeatedly enforced insurance contract provisions under which the time for suit began to run before the insured had a right to sue." *Id.* The Sixth Circuit ultimately "conclude[d] that the limitations provision requiring the Smiths to sue Allstate within one year of their loss, while prohibiting suit during a portion of that year, is not inconsistent with KRS § 304.14-370," reasoning that "[u]nder Kentucky

law, it appears, a cause of action for breach of an insurance contract may 'accrue' in some sense, before the claimant is entitled to sue." *Id.*

As noted in a subsequent opinion, *Tennant v. Allstate*, the *Smith* court left some significant questions unanswered. For example, it remains unclear "how the Sixth Circuit arrived at the conclusion that the limitation provision in [*Smith*] did not violate KRS § 304.14-370." Civ. A. No. 04-54, 2006 WL 319046 at *6 (E.D. Ky. Feb. 10, 2006). The *Tennant* court surmised that the Sixth Circuit either "reasoned that the claim accrued at the loss instead of the breach" or determined that "within the limitations provision, the parties implicitly altered when the breach of contract cause of action at issue accrued." *Id.* However, neither explanation is explicitly stated in the *Smith* opinion. *Id.* Moreover, the *Tennant* court noted that the first possible explanation runs contrary to principles of general contract law. *Id.* As to the second explanation, the policy provision does not specifically state that the parties contractually altered the accrual date, nor has any "Kentucky state court held that, in order to comply with KRS § 304.14-370, the parties may simply agree to alter when a cause of action accrues under the common law." *Id.*

AgriLogic ignores this tension and advocates for a straightforward application of *Smith*. Specifically, AgriLogic believes that Section 16 of the Crop-Hail Policy is valid and enforceable under KRS § 304.14-370 because, like the limitation provision upheld in *Smith*, it gives the parties one year from the date of loss to bring suit. AgriLogic then fills in the gap in *Smith*'s logic by stating that "the parties to an insurance contract can agree to modify not only the limitations period for claims against the insurer, *but also the date upon which those claims accrue.*" (Doc. # 6-1 at 10 and 12). Rather than addressing the accrual issue, Price responds that the limitation provision should not be enforced as to his breach of

13

contract claim because it is "overly restrictive, unreasonable and limits coverage otherwise allowed by enforcing the suit limitation provision." (Doc. # 7 at 13). Because this attacks a different aspect of the limitation provision, the Court will consider Price's points after finishing its accrual analysis.

While the Court certainly has unanswered questions about the *Smith* opinion, particularly its implicit finding that the cause of action accrued on the date of loss, it remains good law within the Sixth Circuit. Because the Sixth Circuit held that a limitation provision requiring a party to sue within one year of the loss complied with KRS § 304.14-370, and because Section 16 of the corn policy sets the same time period for a party to sue, the Court must find that Section 16 complies with KRS § 304.14-370. Price's corn crop allegedly suffered wind damage on July 20, 2012, so he had to bring suit against AgriLogic on or before July 20, 2013. However, Price waited until January 8, 2014, nearly seventeen months after the loss, to sue. Short of a finding of unreasonableness, which will be discussed in the next subsection, the Court concludes that Price's claim is time-barred under Section 16 of the Crop-Hail Policy.

### ii.    Reasonableness

In *Smith*, the court acknowledged that the accrual issue did not end its inquiry, as a suit limitation provision may still be unenforceable if it does not give a party a reasonable time to sue. *Id.* at 405-06. Noting that the Smiths were dilatory in complying with the policy terms, the court found that prompt action would have effectively given them six months to sue, which Kentucky courts have held to be a reasonable limitation. *Id.* at 406. The court rejected the Smiths' efforts to save their claim by arguing that the limitations period should have been tolled from the time the insurer receives notice of the loss until denial, reasoning

that there was no Kentucky law to support such a proposition. *Id.* Having found that the suit limitation provision was valid, the court held that the plaintiff's breach of contract claim was time-barred under the suit limitation provision because the plaintiffs did not file suit until one year and nine months after the loss. *Id.*

Price believes that the policy provision is unreasonable, and thus unenforceable, for three reasons: (1) the corn policy is linked to adjustment and payout on the MPCI Policy, so Section 16 essentially requires him to file a protective suit; (2) AgriLogic initially breached the contract by failing to pay him within thirty days of filing for appraisal, as required by the Policy, and therefore should not be allowed to benefit from the provision limiting time to sue; and (3) Section 16 is akin to the provision struck down as unreasonable in *Elkins.*

Price points out that AgriLogic issued Crop-Hail and Multi-Peril Crop Insurance policies to cover his corn crop. When AgriLogic denied Price's claim for coverage under the corn policy, Price had to continue cooperating with adjusters, maintaining his crop and participating in the settlement process for his pending MPCI claim. Believing these two policies to be "interlinked," Price argues that Section 16 essentially requires him to file a protective suit on his claim under the corn policy. Specifically, Price had to file suit for breach of the corn policy within one year of the occurrence causing the loss or be time-barred from asserting the claim, even though his claim for coverage under the MPCI Policy was unresolved. Because "[t]he law does not require and should not require that an insured file a protective suit to preserve rights under one policy (crop hail) with one hand, while continuing to operate in good faith with the insurer and their adjusters for payment on the other hand, without having the benefit or knowledge to know whether the remaining

portion of the policy on the same crop (MPCI) will be paid," Price concludes that Section 16 should not be enforced. (Doc. # 7 at 12).

While AgriLogic issued both the corn policy and the MPCI policy to cover the same crops, the record indicates that these policies are independent of each other. The MPCI Policy is a product issued and underwritten by AgriLogic, subject to regulation by the federal government. (Docs. # 6-6 and 7-13). Moreover, it insures against a variety of natural perils, such as drought, excessive moisture, freeze and disease. (*Id.*). The corn policy is a private product, marketed and sold by AgriLogic, that covers loss from hail, fire, transit and vandalism. (*Id.*). In short, each policy insured against different perils, carried separate terms and conditions and required a separate adjustment process. Having determined that the policies are not intertwined, the Court finds Price's "protective suit" argument to be inaccurate and unpersuasive. There is nothing to suggest that Price's ability to pursue his suit for breach of the corn policy depended upon AgriLogic's adjustment of his claim for coverage under the MPCI Policy.

Price also asserts that AgriLogic breached the insurance contract first by failing to adjust and pay the losses within the agreed-upon time period. Because "he who first breaches a contract must bear the liability for its nonperformance," such that "no benefits should be obtained by the party who is guilty of the first breach," Price argues that AgriLogic should not be able to invoke the contract provision limiting the time to bring suit. *Puckett v. Hatcher*, 209 S.W.2d 742, (Ky. 1948).

To accept this argument would be to render all similar provisions meaningless. When a plaintiff brings suit for breach of contract, the allegation is that the defendant breached the contract by failing to perform in some way. If the plaintiff could simply point

to the defendant's alleged non-performance and successfully argue that the defendant is not entitled to invoke the contract's limitation provision, it is hard to imagine a situation in which such a limitation provision would have teeth. Indeed, these provisions are fashioned for scenarios in which one or both parties fail to perform their respective obligations. If both parties do precisely what they agreed to do, there is unlikely to be a dispute leading to litigation. Because Kentucky has a strong public policy favoring contractual limitations on time to sue, as evidenced by the above-cited statutes and case law, the Court is not inclined to accept an argument that would severely undermine that policy. *See Webb*, 577 S.W.2d at 17.

Finally, Price analogizes the provision at issue in this case to the one invalidated in *Elkins v. Ky. Farm Bureau Mut. Ins. Co.*, 844 S.W.2d 423 (Ky. App. 1992). In that case, the Kentucky Court of Appeals found that a policy provision, which required a party to assert an uninsured motorist claim within one year of the accident, was unreasonable and unenforceable because it conflicted with the two-year period set out in the Motor Vehicle Reparations Act. *Id.* at 425. At first blush, this decision seems contrary to the Court of Appeals' prior opinion in *Webb*, which upheld a fire insurance policy provision requiring a party to file suit within a year of the loss, reasoning that the provision was not in conflict with the fifteen year statute of limitations applicable to actions on a written contract. However, the *Elkins* court decided that *Webb* was not controlling for two reasons: (1) one can ascertain his or her rights under a fire insurance policy, like the one at issue in *Webb*, on the date of loss or soon thereafter; and (2) *Webb* dealt with a conflict between a one year contract limitation and the fifteen year statute of limitations for suing on a written contract, rather than a conflict between a one year contract limitation and the two year

17

statute of limitations set by the Motor Vehicle Reparations Act. *Id.*

The Court of Appeals ultimately found that the one year limitation provision was unreasonable because it "inhibits the fulfillment of the purpose that a claimant should have the same rights as he would have against an insured third party." *Id.* (internal citations omitted). The *Elkins* opinion concluded with the following language, which communicated the limited scope of this decision:

> This decision in no way derogates the rule enunciated in *Webb*, [ ] that a shortening of the limitation period in which an action must be brought is not per se restrictive or unreasonable when applied to all types of insurance contracts. However, when applied to uninsured motorist coverage in an automobile insurance policy, such a limitation is overly restrictive, unreasonable, and limits coverage otherwise allowed by statute.

(*Id.*).

While Price takes care to explain the distinctions between *Webb* and *Elkins*, he never explains *why* Section 16 of the corn policy is akin to the provision considered in *Elkins.* In fact, the Court believes that just the opposite is true. While *Elkins* appears to be a narrow holding, dealing precisely with the uninsured motorist setting, this case possesses the critical elements of *Webb.* For one thing, Price was able to ascertain his rights under the corn policy on the date of the loss or soon after. Second, there is no conflict between Section 16 and a statute specifically setting a time to bring suit in crop insurance disputes. Therefore, the Court does not believe that the *Elkins* decision affects the outcome of this case.

Having found that Section 16 of the corn policy is valid under KRS § 304.14-370 and otherwise reasonable, Price's breach of insurance contract claim is time barred. There being no genuine issues of material fact, AgriLogic is entitled to summary judgment on this

18

claim.

### C. Is Section 16 of the corn policy valid as to Price's bad faith claim?

In *Tennant v. Allstate*, the court considered the validity of the exact same limitation provision at issue in *Smith*, but this time in the context of a bad faith claim. Civ. A. No. 04-54, 2006 WL 319046 at *1-2 (E.D. Ky. Feb. 10, 2006). After recognizing *Smith*'s implication that a breach of contract claim could accrue at the loss, the *Tennant* court expressed its reservations about that decision and opted not to extend that logic to the bad faith context. *Id.* The *Tennant* court reasoned that "because a cause of action accrues when the last event necessary to create the cause of action occurs, a bad faith cause of action in which the allegation is that the insurance company *wrongfully denied* an insured's claim cannot accrue until denial of the claim." *Id.* at *3. Accordingly, the court found that the Tennants' bad faith claim accrued when Allstate denied their claim on August 11, 2003. The limitation provision required the Tennants to bring suit within one year of the loss, which occurred on December 1, 2002, so they effectively had only four months to sue. *Id.* The court concluded that "when applied to the Tennants' bad faith claims, the one year limitation provision in the insurance policy is inconsistent with KRS § 304.14-370," and therefore, the claim was not time barred. *Id.* at 3-4.

AgriLogic asks this Court to overlook *Tennant* because it is "poorly reasoned and patently inconsistent with Kentucky law and the Sixth Circuit's reported decision in *Smith*." (Doc. # 10 at 8-9). According to AgriLogic, *Smith* supplies the proper rule for accrual in the bad faith context because it stands for the proposition that the parties can contractually modify the accrual date for a cause of action. Price, basing his argument on *Tennant*,

states that his bad faith claim did not accrue until AgriLogic denied his claim on February 28, 2013.  Price contends that the limitation provision, which requires him to sue on or before July 20, 2013,  is invalid under KRS § 304.14-370 because it effectively sets up a five month period for Price to sue.

The Court first notes that AgriLogic takes some significant liberties with the *Smith* opinion with respect to Price's bad faith claim.  As discussed in great detail, *Smith* never explicitly states that the parties may contractually modify a cause of action's accrual date. *Smith* is also silent as to whether this rule applies in the bad faith context.  After all, the *Smith* court granted judgment in Allstate's favor on the bad faith claim because its "conclusion that the contractual limitations provision was valid and enforceable. . . .is dispositive of the Smiths' claim that invocation of the provision constituted bad faith on the part of Allstate," as the plaintiffs themselves conceded at oral argument.  *Smith*, 403 F.3d at 407.  Therefore, the Court agrees with the *Tennant* court that the *Smith* does not "resolve the issue before this Court which is when a *bad faith* cause of action accrues." *Tennant*, 2013 WL 319046, at *6 (emphasis added).

In this case, Price's bad faith claim is predicated on AgriLogic's alleged wrongful denial of his claim for coverage.  Because AgriLogic's denial of the claim on February 28, 2013 was the last event necessary to create the cause of action, the Court concludes that Price's bad faith claim accrued on that date.  However, Section 16 requires Price to sue on or before July 20, 2013, effectively giving him just five months to bring suit.  Under these circumstances, Section 16 of the corn policy is invalid as to Price' bad faith claim because it violates KRS § 304.14-370.  Therefore, Price's bad faith claim is not time-barred.

**5.** **The Kentucky Unfair Claims Settlement Practices Act**

**A.** **Basic Principles**

To state a claim under KUCSPA, a plaintiff "must meet a high threshold standard that requires evidence of 'intentional misconduct or reckless disregard of the rights of an insured or claimant' by the insurance company that would support an award for punitive damages.'" *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1999)(*quoting Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993)). Once the plaintiff has made this initial showing, he or she must "establish three elements to maintain a bad faith claim, regardless of whether the claim is brought under common law or statute: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Rawe v. Liberty Mut. Fire Ins. Co.*, 462 F.3d 521 (6th Cir. 2006)(*citing Wittmer*, 864 S.W.2d at 890).

In challenging Price's bad faith claim, AgriLogic first argues that Price's claim must fail because he did not establish an obligation to pay. Secondly, AgriLogic asserts that Price has failed to meet the high evidentiary standard required to maintain a bad faith claim. Although AgriLogic addresses this issue as though it relates to the second and third elements of the bad faith test, these elements depend on evidence similar to the threshold inquiry. *Powell v. Cherokee Ins. Co.*, 919 F. Supp. 2d 873, 878 (W.D. Ky. 2013). Because Price would not be able to satisfy the three elements of bad faith without first satisfying the threshold inquiry, the Court will consider whether there is evidence of intentional

misconduct before analyzing the individual elements of his claim.

> **B.     Price has failed to present evidence of intentional misconduct sufficient to support an award of punitive damages.**

To survive Kentucky law's high threshold inquiry, a plaintiff "must show 'evidence of intentional misconduct or reckless disregard of his or her rights by the insurance company that would support an award of punitive damages.'" *Powell*, 919 F. Supp. 2d at 879.  Stated another way,

> The evidentiary threshold is high indeed.  Evidence must demonstrate that an insurer has engaged in outrageous conduct towards its insured.  Furthermore, the conduct must be driven by evil motives or by an indifference to its insureds' rights.  Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury.  Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith.  Inadvertence, sloppiness or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown.

*Id.* at 880 (*quoting United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181 (Ky. App. 2003)).

In *Phelps v. State Farm*, the Sixth Circuit Court of Appeals found that Phelps presented sufficient evidence of lowball offers, delay tactics and questionable claims-handling practices to meet the threshold inquiry.  736 F.3d 697 (6th Cir. 2012).  First, Phelps demonstrated that State Farm's initial offer of $25,000 not only failed to reasonably account for her pain and suffering and future wage loss, it was "just barely above the low-end of both [State Farm's] own evaluation of the claim ($24,620 to $49,620) and Phelps's documentation of medical and wage loss costs ($22,620.22)." *Id.* at 705.  Second, Phelps showed that State Farm delayed settlement of the claim for three years. *Id.* at 705-06.  Specifically, State Farm refused to make an initial valuation of Phelps's claims until it reviewed medical records relating to a prior injury, but made no effort to obtain these records for over six months. *Id.*  State Farm also repeatedly refused to disclose its

insured's policy limits, switched claims adjusters four times without explanation, refused to increase its offer without documentation of additional damages and failed to include facts in the claim file that would support a jury verdict in Phelps's favor. *Id.* at 706-07.

In *Powell v. Cherokee*, by contrast, the court found no evidence of outrageous conduct driven by evil motives, even though Cherokee failed to settle the claim for almost five years. 919 F. Supp. 2d 873 (W.D. Ky. 2013). The court attributed most of the delay to Powell's own dilatory behavior, noting that Cherokee sent interrogatories to Powell just one month after she filed suit but received no response for almost three years. *Id.* at 880-81. Although Powell also summarily argued that Cherokee has some of the same claims-handling practices questioned in *Phelps*, the court found that "much of this argument actually goes to [Powell's] position that Cherokee unduly delayed or failed to promptly investigate her claim," which the court had already dismissed as unpersuasive. *Id.* at 882-83. Concluding that Powell had failed to meet the threshold inquiry for bad faith claims, the court granted summary judgment in Cherokee's favor. *Id.* at 883.

According to AgriLogic, Price has failed to meet this high evidentiary standard because the record shows no evidence of an evil motive or reckless indifference to Price's rights. Instead, AgriLogic communicated regularly with Price, engaged in further investigation only when the circumstances warranted further action and attempted to remedy McNew's errors. (Doc. # 6-1 at 16-17). Price responds that he has put forth sufficient evidence of outrageous conduct, citing the following malfeasances: (1) AgriLogic allowed its investigator to trespass on Price's property; (2) AgriLogic made Price "jump through hoops" by requesting further documentation for wind damage; (3) AgriLogic denied the claim because there was no evidence of hail damage, even though Pro-Line already

clarified that the claim was for wind damage; and (4) AgriLogic failed to disclose difficulties with its independent adjuster. (Doc. # 7 at 18-19).

In arguing that AgriLogic's investigator "trespassed" on his property, Price ignores Section 3 of the corn policy, which imposes upon him a duty to allow AgriLogic to examine the damaged crop as often as reasonably required. (Doc. # 6-6 at 3). The provision is notably silent as to whether AgriLogic must notify its insured before entering the property. (*Id.*). Because AgriLogic's investigator entered Price's property for the sole purpose of conducting a ground audit of the damaged corn crop, the Court finds that AgriLogic has done no more than exercise rights that were allocated to it in the contract. Price consented to inspection of his crops, and while he may not approve of the manner in which AgriLogic conducted this inspection, he cannot now argue that AgriLogic acted in bad faith by doing something that he agreed to in the insurance contract.

By the same token, the Court believes that AgriLogic's request for further documentation was within the bounds of the corn policy. Section 3 imposes upon Price a duty to provide production and marketing records upon request. (Doc. # 6-6 at 3). Here, AgriLogic did not even require Price to produce this information. Instead, it asked for any further documentation, such as production records and photographic evidence, that would support his claim. If the insurance contract requires Price to produce records upon request, the Court does not believe that AgriLogic acted in bad faith by simply asking for miscellaneous information to support his claim. Price maintains that AgriLogic made him "jump through hoops" by making this request when they had all but decided to deny his claim. (Doc. # 7 at 19). However, there is nothing in the record to suggest that AgriLogic had already decided to deny the claim. While AgriLogic may have had its doubts about the

legitimacy of Price's claim, it was simply trying to do its due diligence in investigating the claim, especially in lights of its problems with its independent adjuster. Therefore, the Court does not believe that AgriLogic's request is evidence of outrageous conduct.

Price also argues that AgriLogic's reasons for denying the claim were misplaced. According to Price, AgriLogic denied the claim because there was no evidence of hail damage, even though Pro-Line informed AgriLogic that the claim should have been submitted as wind with hail damage. (*Id.*). While AgriLogic's letter does note the lack of hail damage, the Court does not believe that this was the sole ground for denying the claim. (Doc. # 6-20). Rather, the Court reads this letter as detailing AgriLogic's steps in processing the claim. AgriLogic first tried to confirm the hail damage. Finding none, and being informed of Pro-Line's error, AgriLogic then began processing the claim as one for wind damage. When it found no evidence of wind damage, it asked for supporting documentation from Price. Finally, AgriLogic considered all available information, including that submitted by Price, and found no evidence of payable wind damage. In short, AgriLogic redirected its investigation efforts to the claim for wind damage and ultimately denied the claim because photographic and video evidence "confirms that the fields in question sustained no payable damage from wind." (*Id.*). Therefore, the Court does not believe that the denial was founded on improper grounds.

As to Price's assertion that AgriLogic failed to disclose its issues with Mike McNew, there is no indication in the record that this was done to deceive or mislead Price. Moreover, only extreme issues with adjusters seem to support an inference of bad faith. For example, the *Phelps* court took issue with the fact that Phelps's claim was bounced to four different adjusters without explanation, resulting in considerable delays. 736 F.3d at

705-06. Here, there is no evidence that AgriLogic's decision to fire McNew resulted in any delays. It also appears that AgriLogic attempted to rectify this issue by conducting its own field and aerial audits and allowing Price to submit information in support of his claim. Even if AgriLogic would have done better to notify Price of its difficulties with McNew, imperfect claims handling practices are not sufficient to support an inference of bad faith. *See Powell*, 919 F. Supp. 2d at 882-82. Stated simply, this evidence "falls short of providing a foundation upon which a jury could premise a finding of bad faith." *Id.*

Because Price has failed to show evidence of malfeasance sufficient to satisfy Kentucky law's threshold inquiry for bad faith claims, the Court need not consider the parties' remaining arguments regarding AgriLogic's obligation to pay. For all of these reasons, AgriLogic is entitled to summary judgment on the bad faith claim.

### 6. Plaintiff's Claims for Punitive Damages and Slander

As to Price's claim for punitive damages, AgriLogic correctly points out that such a claim is not an independent cause of action. *Shibeshi v. Alice Lloyd Coll.*, Civ. A. No. 11-101-ART, 2011 WL 4970781 at *5 (E.D. Ky. Oct. 19, 2011). "Rather, certain torts entitle a plaintiff to punitive damages." *Id.* Price acknowledges that this statement of the law is accurate and clarifies that he is seeking punitive damages for AgriLogic's alleged violations of the Kentucky Unfair Claims Settlement Practices Act (KUCSPA). (Doc. # 7 at 2). Indeed, KUCSPA does contemplate an award of punitive damages if there is "sufficient evidence of intentional misconduct or reckless disregard of the rights of an insured or a claimant." *Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993).

However, dismissal of a punitive damages count is proper when the underlying tort claims have been dismissed. *Russell v. Rhodes*, Nos. 2003-CA-000923-MR, 2004-CA-

000492-MR, 2005 WL 736612 at *5 (Ky. App. Apr. 1, 2005). For reasons already explained herein, Price's bad faith claim fails because he did not present sufficient evidence of such intentional misconduct. Therefore, the punitive damages claim must also be dismissed.

Price concedes that his slander claim should be dismissed. Therefore, the Court may grant AgriLogic's motion to dismiss that claim without delving into the substantive arguments. (Doc. # 7 at 20-21).

### III. Conclusion

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendants' construed Motion for Summary Judgment (Doc. # 6) be, and is hereby, **granted in full**; and

(2)    A Judgment shall be entered contemporaneously herewith.

This 7th day of August, 2014.



Signed By:
David L. Bunning
United States District Judge